today on oral argument. And we begin with United States v. Toussaint. Mr. Boydman. Good morning, Your Honor. May it please the Court, Kevin Boydman for the Government. Your Honor, this case presents an example of successful police work upon receiving a credible threat to harm someone who was not fully identified when that threat came from a member of a known violent drug trafficking organization. Within 45 to 50 minutes, the officers had successfully found this formerly unidentified person, the target of the threat, and stopped him. Unfortunately, the target decided to run, flee. There was a chase, brief chase, gun and drugs were found on him, and he was charged. You're relying on exigent circumstances? Yes, Your Honor. Specifically, we believe the emergency aid doctrine governs this case. Is it correct that we would be the first circuit to apply that to a traffic stop type situation? From what I can tell, yes, Your Honor. Neither the district court, myself, and I don't believe opposing counsel either, have found a case in which the exception has been applied to a traffic stop or terrorist stop situation. However, I believe, and this is the first point of the argument, the emergency aid doctrine does apply and should apply here. Brigham City, Utah v. Stewart, of course, set the doctrine in place. And the primary understanding of that is the officers need to assist persons who were seriously injured or threatened with such injury, such that it is an exigency obviating the need for the warrant. Now, all the cases that have come up have come up in the context of breaking into the house, going into that threshold. There's no logical reason or legal reason that it should not apply to a traffic stop or a terrorist stop situation, which— A home enjoys more Fourth Amendment protection than a vehicle. Exactly. That's exactly the point, Judge Goss, where the home has much more security, much more privacy interest than a vehicle does, and that's always been recognized. So there's really no reason that it would not apply to a car as well as to a house because the basic theme behind the emergency doctrine is not where the emergency occurs. It's the need for an emergency in the first place. And you have that here in this case. And it starts with that threat, which the district court found credible in this case. The agent received a call on a wiretap from someone related to the Harvey Hustlers, a violent drug trafficking organization. And while the phone was on the phone of the person who was being wiretapped, the person who asked for permission to make the hit on Tosh Tucson was unknown. So officers did not know this. All they knew was that someone named Todd or Ty or Tosh was in danger of this hit. And so the agents did what they needed to do. Keith Burris was— Was Mr. Tucson on their radar screen as—you know, typically when they have these wires, they have a whole map of the organization they're investigating. Was he someone known to them as affiliated with this organization? The record is silent on that, Judge Costa. What I believe the agent understood with the name Todd or Tosh may have been someone, but there was never a clear Tosh Tucson. It was never known of that. At most, from what we gather, is that Todd or Ty or Tosh was a name that may have been. But I think it's also, whether he's on the board or not, I think this is important. If you have a violent drug trafficking organization ordering a hit on someone or giving the green light to someone who wants to go take care of it, I think it's reasonable to suspect that the target could be involved or there could be some suspicion that he may be more than just a perfectly innocent bystander. And I don't think that was ever been denied. I guess I'm just trying to figure out how they found him so quickly. All they knew was it was a silver Infiniti in that part of town? That's correct, Your Honor, and that's what they had to go on, which obviously was not a lot. But the agent was familiar with the investigation. The agent was familiar with the area in Glendella Drive on the West Bank. And they knew they were looking for a silver Infiniti. That was one of the reasons for the part of the planning meeting that they had because you were bringing in some officers who were not part of the team. And so when they went in there, they were really just looking for a silver Infiniti. There were a number of silver Infinitis that one of the officers saw, but there was no one in those. And so the idea is not just to stop a silver Infiniti, they're looking for someone. And when they decided, when they found this one left after they'd been patrolling in the area for a little while, they found that one Infiniti with a driver leaving that area. And so that was one of the reasons they stopped. That was one of the reasons suspicion came on that. Why did they wait to pace him and find a speeding violation if they truly thought his life was in danger and this was an exigent circumstance? Agent Cadet testified that it was a procedure for him. And just as a point of reference, obviously we're not appealing the judge's decision on the traffic stop, just for record. But it was a decision they made. It was a decision they made at the time. Could they have done something a little quicker? Yes, they probably could. But one way or the other, Judge Costa, they would have had to stop him to advise that person. So whether you stop him two blocks earlier or whether you stop him a little later is a matter of discretion for the officers. And I think that's something that the courts have to give the benefit of the doubt to the officers on the scene. And, of course, that goes to where the courts have always said in these types of situations with exigencies, the court shouldn't second-guess the techniques that the officers take because they have to make those decisions. They chose not to make the stop in the neighborhood itself. Now, could they have stopped in the neighborhood themselves? Yes, but they waited until they actually turned out on Highway 90 and got right after it. That's a decision they made to do, and it's something that they have the ability to do. And courts, in hindsight, never works out. And that's why the rules are to give the benefit of the doubt to the officers in that case. Here, the court, and this is where we believe the district court erred first and foremost, by looking to the subjective intent and second-guessing these techniques, and that's one of the problems. Here, the district court looked to what it considered the lack of police urgency on the action, specifically showing Detective Roniger's receipt of the call and the delay between receiving the call and then actually stopping him, the judge said, called the question of the exigency in the question, called the urgency in the question. She felt that Judge Brown felt that Detective Roniger did not act with a sense of urgency, and that undermined the finding of the ongoing emergency. Even saying, presumably, officers should have monitored other calls, and even, Judge Goss, kind of what you said, why didn't they stop before? The problem is with all this, it goes away from what the courts have said to take a look at. What is the objective reason, what is the response? Was it objectively reasonable what the officers did? Was the call recorded? The wiretap calling? Yes, it was, Judge Goss. There is hard evidence. This isn't just we heard this and this is what we did, and we have no tangible evidence of what we heard. No, that's correct, Your Honor. The wiretap call was recorded. It was in the record, and a transcript was given to the record of all. So it is there. It wasn't just the agent saying this is what I heard. The agent testified to it, of course, but it was in evidence and recorded. And, of course, it just had the basic information on it. And the court, nonetheless, credited it. So the fact that that call occurred and created an exigency is not really in question. The district court did credit that. And once credited, the officers had a duty to do everything they could to go find this person, and in 45 minutes they did. The district court, by looking to the subjective intent and ultimately saying it was not enough and that the lack of urgency of what the district court perceived was lack of urgency, cut against the finding of exigency, was wrong. It's the wrong focus. At the heart of the district court's concern was the brief planning meeting that Detective Roniger had with Officer Cadet and the other officers. The district court felt that that was a problem and actually cut against urgency. But the planning operation was necessary and it was objectively reasonable to have a brief planning operation here. The threat was from an unidentified person. It was against an unidentified person. But we know the threat was coming from a member of a violent drug trafficking organization. It was at nighttime. Not all of the officers that were going to be taking part in this patrol were part of this investigation. It was not unreasonable to briefly meet to discuss. And under the circumstances, it is not unreasonable for the officers to pause briefly and discuss a way to safely locate this person, notify him, and then do it in a way that does not put him, the police, or the people in that neighborhood in any danger. So this brief planning meeting objectively was not a problem. Basically, what the officers were doing was sort of a belt and suspenders operation. When they tracked this guy, they thought, well, you know, yes, we're out there to render help, but that's sort of new territory, and if you get them for a traffic stop or something, it'd be better. But they didn't, so Plan A instead of Plan B. Agreed. And certainly, officers in this court, I'm sure, are familiar with other drug trafficking cases. There may be multiple ways that people stop, and if there is a traffic stop that's involved, that is occasionally done. Without that here, this case is still governed by the emergency aid exception, which is where the police had and where law enforcement had from the beginning. And it had it for all 45 minutes. There's no reason to believe the exigency ended, and this is the second part of the error we raised. Because the judge was looking at the subjective focus, the district court took that subjective focus to say because the police didn't go fast enough, because the urgency was there, that meant clearly the exigency was over. And that's on page 306 of the record. The improper focus led the court to say clearly the exigency is over. The primary problem with this is that it's basing the length of the exigency, the length of the emergency, on what the officers do. This threat on the wire didn't come with an expiration. It didn't say let's kill them in the next 45 minutes. It was a threat to go take care of this person. There's no reason to think it ended earlier. The court found the threat credible, and there's no reason to believe that the caller who was looking to kill Mr. Toussaint would have done so because the police didn't do enough action. The inaction or that it's not as quick doesn't mean the threat ends, and that's why the Len Davis case that we cited is so important in this case. In the Len Davis matter, which involved the murder of Kim Groves, on a wiretap, the first threat came in at 5 o'clock in the afternoon. The police did nothing about it. Another call came in at 9.45 and then at 10 o'clock. At 11 o'clock, six hours after the initial call, Kim Groves was killed. You had police inaction in that case. You had a lack of response to an emergency in that case. That didn't mean the threat ended. And Len Davis is not a hypothetical case study. It was a case by the FBI out of the Eastern District of Louisiana. It's a real case. It's a real matter. And it's a real example of why, just because the officers might not do something that the district court thinks it should have, that doesn't mean the emergency ends. That doesn't mean the threat to kill ends. This is not the case of bad police work. As I said, this is a case of good police work, which led to the successful location of this target without any danger. This is not a case that the exclusionary rule should apply to. Finding the unidentified target of this threat within 45 minutes was good work. And this is why reversal is important in this case. The exclusionary rule does not apply. The exclusionary rule, the purpose of it, is to deter police conduct or improper police behavior. This is not the type of case where we want to deter police. In this situation, the police did what was expected. If no evidence would have been recovered, if the stop would have been made and Mr. Toussaint would have had his driver's license and had not fled and no evidence was recovered, I don't think anybody would be sitting here saying that's bad improper police work. Likewise, if the police would not have done anything for 45 or 50 minutes and at the 51-minute mark Mr. Toussaint is killed, I don't think anybody would have been saying, well, the police did all they could have done. Here, the police had a duty, as long as this emergency was real, as long as it was reasonable for this emergency to believe this emergency existed, they had a duty to try to find him, and that's what they did. Michigan v. Fisher, the language in that court says, it does not meet the needs of law enforcement or the demands of public encountered here. Only when an apparent threat has become an actual harm can officers rule out the innocuous explanations for ominous circumstances. We don't require officers to walk away from something because in a few minutes they don't see a problem. That's never been the policy of this court. De Jesus Patras is an example where 45 minutes was perfectly okay, and it's similar in this case. The threat did not expire. The threat was ongoing, and the officers were acting reasonably and indeed acted successfully to find him. In conclusion, this is not the case to suppress evidence. The officers acted professionally and adequately and objectively reasonable in the circumstances. Within 45 minutes, they found this unidentified subject of this threat and got him out of harm's way. The threat did not dissipate, and the emergency had not ended simply because the officers had a planning meeting. And to the extent the district court considered subjective reasoning and second-guess techniques to come to that decision, the district court erred. We respectfully request this honorable court reverse the decision of the district court. And I'll save time for rebuttal. Yes, Mr. Borman, you've saved time for rebuttal. Thank you, Judge. All right, Mr. I'm going to mispronounce it probably. Is it toll? You got it right. Toll is correct. Toll is correct. For whom the bell tolls, toll booth. Good morning. May it please the court, my name is Robert Toll. I'm here on behalf of Tosh Toussaint. I think as you read the record as a whole, Judge Brown didn't apply the subjective intent or the motives of the police officers, which is really the gist of the government's argument. Judge Brown held that it appeared from the evidence and the testimony that whatever exigency existed at the time of the wiretap call, it had clearly subsided. And when Cadet started pacing Toussaint's vehicle, he was not acting in response to exigent circumstances. What evidence indicates that 45 minutes after the threat, she found that there was a threat heard on the wire? She did. What evidence led her to conclude that 45 minutes later that threat no longer existed? Well, I think there's one way you can look at it, and that is to listen clearly to the recording that's contained in the record, that one person calls from the West Wego area to a man named Williams and says there's somebody around, what do you want me to do? And he says, do it, but if there are people around or it's hot, don't do it. And so I think it's very easy to infer from that conversation that the shooter is right at the scene within seconds or minutes from his target, and if it was going to be carried out, it would have been done in a matter of minutes. And nothing happened. Nothing happened. You would say even if they got there 20 minutes later, that would have been? The exigency would have gone away? You know, I don't know. I don't know that I can answer that. You know, 45 minutes certainly is too long. Possibly 20 minutes. I think, you know, without telling the police how to do their job, I think the smarter thing would have been to call 911 immediately and get police to the scene rather than what happened was Agent Buras with the FBI called Deputy Ronecker, who's doing a detail in Metairie at a grammar school. He hops in his car to drive to West Wego to meet with two other units, one of them being Deputy Cadet, who was the one who pulled him over. They have a meeting there, and then they go into the Kennedy Heights subdivision, which Glendella, the street in which my client was stopped, is one of those things. You said they should have called 911 and gotten a car immediately to the scene, but wasn't the challenge that no one knew the exact scene, they just knew this car was driving around the neighborhood? They knew it was on Layman Street, and Layman Street is only two or three blocks in the Kennedy Heights area. And since you bring it up, it's interesting that Detective Ronecker said that they never even went to Layman Street. They went to the Kennedy Heights subdivision, but they never went to the place in question. So, as I was saying, that when cadets started pacing Tucson's vehicle, he was not acting in response to exigent circumstances. And he was pacing, and the judge found that there wasn't sufficient, there wasn't reasonable suspicion to pull him over, and the government's not challenging that part of the seizure. She noted that Cadet and Ronecker performed proactive patrols, and both of these testified that they went out to the Kennedy Heights subdivision for proactive patrols, and when you read the transcript, you'll see the proactive controls is when they look for something suspicious and they start pulling people over. Cadet testified that there were many silver infinities at the location. Ronecker said he didn't see any, that this was the first. There are many, many inconsistencies throughout the transcript of both of the officers. The government acknowledges that the emergency aid exception, at least in the Supreme Court, has only been applied to home searches. What's your position on whether it applies to a traffic stop? Well, it doesn't apply to this traffic stop. But as a general matter, if it was within two minutes, if you didn't have that timing problem you think is out there, if they got there right away, could they have stopped him because of this threat? Maybe. Maybe. You know, I don't know. So they're performing these proactive patrols, and both of them testified that Toussaint was stopped because he was observing committing a traffic violation. And the police report confirms the same. They do not in their report, in their police report, say anything about an emergency. They do not say anything about a threat. And they didn't stop him because of the threat. So in answer to your question whether it applies in other cases, in this case it certainly doesn't apply because they didn't pull him over because of the threat. They pulled him over because of the traffic violation. Ronecker even testified that he was not sure that the person driving was the same one whose life was threatened. The judge further found that at the time of the stop, there was no reliable information of an urgent, ongoing emergency. And when Toussaint was stopped, the decision to stop was not objectively reasonable. The government claims that the judge's ruling rested on an incorrect analysis of the law. They point to her questions during the hearing and before the hearing to suggest that she focused on the subjective intent of the officers in second-guessing a spot decision. However, her order and reasons clearly show otherwise. She, in fact, cites many of the same cases that the government cites. The Brigham v. Stewart case is really the case, and I'll get into that a little later. But clearly it's her analysis. She does apply the analysis for the emergency exception. In fact, she states in a quote in regards to the emergency aid exception that it depends not on the officer's subjective intent or the seriousness of any crime they are investigating when the emergency arises. So she knows that. She knows that subjective intent has no bearing on her decision. And I think she is entitled by this Court to some deference. The government repeatedly claims that she focused on their intent. Excuse me. It's clearly unfounded. And she doesn't only cite Brigham Young once. She does it a number of times. But at one time she quotes that in Brigham, the reasonableness measured in objective terms by examining the totality of the circumstances, excuse the bright-line rules, instead emphasizing the fact-specific nature of the inquiry. So she's applied the right law. She's applied the analysis. It's a very thorough opinion that I think it spans over 50 pages. It begins with an analysis of the testimony. Each of the parties positions the law, and then she applies the law, as she's supposed to do. She recognized that the Supreme Court cautioned to avoid the risk of second-guessing the officers based on 20-20 hindsight, and that the Court must still ensure at the time the officers acted there was reliable information of an urgent ongoing emergency because it is essentially a factual determination. And she determined that it was over. She also notes that the Supreme Court rejected the defendant's assertions in the Brigham case that the Court should consider subjective motives of officers. This Court's review is clear error. Judge Brown did not apply the wrong legal test for exigent circumstances or the applicable law for a traffic stop. The government has not shown that Judge Brown was clearly erroneous and her factual findings should be accepted by this Court. Fourth Amendment questions always come down to reasonableness. Tell us how it's unreasonable for police to stop someone trying to help him because they think there's a hit-out on him. I mean, it seems that if they hadn't done this and your client had been shot, we could possibly be here on a 1983 case where he'd be saying they violated my rights by not helping me. You know, the police's own actions indicated that they thought that the emergency had ended, and clearly I think it's reasonable for the judge to believe that it had ended. They were leaving the scene at the time. Leaving what scene? Well, they were leaving the neighborhood, the Kennedy Heights neighborhood. They both testified. Both Ronecker and Cadet testified that they hadn't found anything. They were leaving. And objectively, going back to my earlier statement, if a person was shot, it would have been within a matter of minutes. You know, maybe 20 minutes, as you suggest, but 40 minutes is really beginning to stretch it. So what do we do here with the fact that there was a perceived traffic violation, the speeding? I mean, the Supreme Court has gone about as far as I can imagine it could have in saying that once there's been a traffic violation, regardless of the subjective intent, that's the end of the ballgame. They can make a stop. The Wren case was unanimous on the Supreme Court, amazingly, and the court hasn't really backed off of that at all. Well, the government's not challenging her finding on the traffic violation. She did not find the officers credible. She went into a great deal of analysis on Cadet's pacing and his credibility on whether or not he, in fact, did pacing, that the location has stop signs, it has curves. She addressed, I think, two or three of this court's opinions regarding pacing. She did a pretty thorough analysis of that, Judge. The government lists what it believes are historical facts but does not mention the facts that show that the emergency was over, such as the police did not go to the Lehman Street place where the call was made, the police leaving the neighborhood, the police saying they are stopping Tucson for a traffic violation but not to warn him, the police do not know that the driver of the Infiniti was a potential target, and the police report does not even mention a threat. All of this shows that there was no objectively reasonable basis for believing that a person was in immediate need. Now, why did Judge Brown ask the questions about why the police did what they did? I don't know, but it doesn't suggest that she applied the wrong legal standard. Judge Brown was thorough. She asked questions before the hearing and during the hearing. She tried to be prepared. She mentioned that at times during the hearing, she mentioned that she was confused and she didn't understand. When you read the transcript, I just said,  But she wanted to give the officers an opportunity to explain, to help her understand, and for her to make an analysis. She may not have known the standard at the time, but I doubt that because during the hearing, she stated on several occasions to both me and Mr. Renier that she needed objective facts. I think she knew the standard at the time. An objective, reasonable basis to respond, I think, is a matter of minutes, given the set of these facts. As I stated earlier, the caller was on the scene near that target, whoever the target may be. It may not have even been Tosh Toussaint. He was told to do it if there was no one around or the police were not around. Assuming that a person is armed, this takes less than a few minutes. Given this factual scenario, Judge Brown is not clearly wrong. The government argues that the exigency ended is a conclusion not to any deference. But the record is clear. The police stopped because of speeding, not exigent circumstances. The police testified the stop was because of speeding, but the government is not challenging the finding that the court finds the testimony of pacing lacks credibility and not objectively reasonable. And the government failed to meet its burden of showing that the officers had an objectively reasonable basis to initiate the stop of the vehicle. Deputy cadet testified they were leaving the area. When he started pacing, he was not acting in response to exigent circumstances. She noted that they did not know if the driver was the same individual who was in danger. This was the testimony of Detective Ronnicker. She found that the exigency was over. The officers did not conclude that the Silver Infinity needed immediate aid. They clearly did not have an objectively reasonable basis for believing the person is in immediate need. The government, in its reply brief, refers to the one Davis case, and Mr. Boykman had just mentioned it, is misplaced. In the Davis case, Davis was a police officer, and the victim in that case had filed a complaint against Officer Davis. Davis planned the murder with Paul Hardy, who was the shooter. The delay in the shooting was because they couldn't find Groves. But in this case, the shooter knew exactly where the target was. They didn't need to look for him if the caller was outside of this house where he saw the Silver Infinity. There was no reason for a delay. He was either going to take the shot then, or he wasn't. The government also celebrates in their briefing, also before you, that the police accomplished their mission successfully. That is doubtful, as the exigency abated, and the police never found the Silver Infinity on Lehman Street. They only assumed that Tucson was the target. I see that my time is running out. I ask that you affirm the trial court's order, and I thank you. All right. Thank you, Mr. Towle. Mr. Boykman, you've saved time for rebuttal. Do you agree that you need to show clear error here? No, Your Honor. As we stated in the brief, we do believe de novo review is appropriate because the judge, in our opinion, looked and applied the wrong law. As we stated in our brief, de novo review is proper there. I believe Webster and Mask are the two cases we've cited. On the question of law. All right. Moving beyond them, you're certainly entitled to address that, but as to any findings of fact, you would need to show clear error if we conclude that the district court understood the law? Yes, Your Honor. So my follow-up question to that is, specifically, where would you assign clear error? Which findings or subordinate findings would you identify would have us accept the fact that there was clear error? I think the biggest one that is a key in this one is the judge's finding that the exigency had dissipated. Because even under clear error, this court can reverse on clear error if it's left with a firm conviction that something is wrong in the record. Here, something is wrong, and I think the facts of this case show it. Because of everything that was done, because of the nature of the threat, because of the type of threat, because of the unknown nature of who it was initially, who was the target, not fully identifying, that within 45 minutes, that's a very reasonable time for someone to find out. It's actually a very good time to actually be able to find the person that's the subject of this threat within 45 minutes when you don't know who it is initially. But you know that it's someone tied to a drug-trafficking, violent drug-trafficking organization that called in this hit. I think 45 minutes is very reasonable in that situation. Let me ask a question. What if there was no hard evidence of this phone call, and for some reason it wasn't recorded or whatever, so you have the officers saying there's an emergency here and we have to go protect this guy or find him, keep him from being shot, but you don't have any hard evidence of that? We don't have the wiretap call, for example. In this case, Your Honor, there would not be any difference because the district court found that the threat occurred. She credited the threat and credited that the threat did cause an emergency. I will agree that's a different situation if the district court would have said I don't find evidence at the outset. But I think, Judge Costa, as you pointed out, or Judge Smith, you may have too, once this threat was made and once the judge credited it, this is a real threat. We really put police officers in a trick bag if we say, well, 45 minutes is just way too long to find this guy. And that's the problem. So in answer to your question, Judge King, it would not be any different in this case because that finding was made and because it did happen. There would be no other difference in any other finding than the fact that the judge would credit. The first time you were up towards the end of your argument, you were suggesting this wouldn't be an appropriate case for the exclusionary rule because there's no police misconduct to deter. As I read your brief, though, you're just challenging whether there was a Fourth Amendment violation. I mean, you're not making a – are you making a separate argument that even if there is a Fourth Amendment violation, the remedy of exclusion shouldn't apply, which is – I mean, it is a separate question the courts usually confront, but what arguments are you actually making? We do not believe a Fourth Amendment violation occurred here. We believe the emergency aid doctrine applies. We believe the officers had every right to act like they did and reasonably that they did what they had to do. They could not do anything other than stop this man to tell him what the threat was. Beyond that, though, we don't – certainly if the court feels differently, we don't feel this is the case for an exclusionary rule for the reasons I stated before. But is that in your brief, that separate argument that the remedy is not appropriate if there was a violation? We probably did not separate it out like that. I'd have to double check. I know we've – You didn't make a good faith argument, for example. No, no. We're not relying on good faith. We're relying solely on the emergency aid doctrine. And briefly here, Your Honors, I have to disagree respectfully with counsel where it says the order shows that the district court did not look to the subjective intent, page 304 to 306. From the order, the officers did not reasonably believe that a person was in need. Roniger's response undermines a finding because he did not act with a sense of urgency. The officers did not arrive at the scene or conduct their investigation with any sense of urgency. None of these concerns address the intent of the person who made the hit. And all of these concerns address the subjective intent of what the court believed. We think that is the wrong focus. This is a fact-specific case, but the facts of this case show that the officers did exactly what you would expect them to do. And, Judge Smith, getting back to your question, Judge Costa, I believe you asked as well, the emergency aid doctrine should apply to this case. The focus is on the need to give aid and protection from harm, not whether it's a car or a house. And there's no expansive rule we're asking, just the application of the doctrine. Well, and again, I had asked my very first question of you, so I just want to be sure that I understand because you answered yes, that this would be the first time a circuit had applied exigent circumstances to a traffic stop. So, I mean, are you representing the position of the Department of Justice that yes, we should make that leap and that pronouncement as a matter of law? Yes, Your Honor. And I can say that as writing this and getting guidance throughout this case from the Solicitor General's office, the position was there's no logical or legal reason they can see why the emergency aid doctrine would not apply to a Terry Stop traffic stop situation. All right. Thank you, Mr. Hoytman. Your case is under submission. Thank you, Your Honors.